**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
**www.flmd.uscourt.gov**

In re:

MATTRESS PAL HOLDING, LLC[1]

Debtor.

Case No. 6:19-bk-02247 (\_\_\_)
Chapter 11

_____/

**DECLARATION OF MADHAT SALEM IN SUPPORT**
**OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Madhat Salem, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

## I.    INTRODUCTION

1.    I serve as Vice President of Mattress Pal Holding, LLC ("Mattress Pal" or the "Debtor"), the debtor and debtor-in-possession in this chapter 11 case. I have served in such capacity continuously since 2012. I also serve as Vice President of SOS Furniture Company, Inc. ("SOS"), the sole owner and parent company of the Debtor. I have served as Vice President of SOS continuously since 2010 and as President of Sales at SOS since 2003.

2.    The facts set forth in this Declaration are based upon my personal knowledge, my discussions with the Debtor's management team and advisors, and my review of the relevant documents and information concerning the Debtor's operations, business, and financial affairs. I am over eighteen (18) years of age and am authorized to submit this Declaration on behalf of the Debtor. If called upon to testify, I could and would testify competently as to all the matters set forth herein.

3.    On April 7, 2019 (the "Petition Date"), the Debtor commenced a case (the "Chapter 11 Case") by filing a petition for relief under chapter 11 of the United States

---

[1] The Debtor's corporate address and principal place of business is located at 2507 Investors Row, Suite 100, Orlando, Florida 32837. The last four digits of the Debtor's tax identification number are: [7172].

Bankruptcy Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the Middle District of Florida (the "Court"). The Debtor is operating its business and managing its assets as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No creditors' committee, trustee or examiner has been appointed in the Chapter 11 Case.

4.    To minimize the adverse effects of the Chapter 11 Case on its business and to ensure the Chapter 11 Case facilitates the Debtor's goal of a successful reorganization, the Debtor has filed certain motions and pleadings seeking various types of "first day" relief (the "First Day Pleadings"). I am familiar with the content of the First Day Pleadings and the relief sought therein is necessary to enable the Debtor to continue to operate in Chapter 11 and preserve its going concern value and is in the best interest of the Debtor and its estate.

## II.    GENERAL BACKGROUND

### A.    Overview of Debtor's Business

5.    Mattress Pal is part of a family-owned business headquartered in Orlando, Florida that operates as a specialty retailer of mattresses throughout the State of Texas. Mattress Pal leases seventy-nine (79) retail stores and one 90,000 square foot distribution center, all of which operate under the "Mattress One" and "Mattress 1 One" brand names. Mattress Pal sells a wide variety of mattresses and bedding accessories acquired from national suppliers and has built a strong brand with a reputation for high quality products delivered by a well-trained, knowledgeable sales force. This reputation differentiates Mattress Pal from competitors, including other specialty mattress dealers, mass merchants and online retailers, and generates customer loyalty.

6.    Mattress Pal is one of the largest mattress retailers in Texas, employing approximately 132 individuals. The prototypical Mattress Pal retail store is 2,500 to 3,500

square feet and offers the sale of mattresses and bedding accessories such as sheets, blankets, pillows, comforters and bedroom furniture. The strategic placement of Mattress Pal's stores and high-quality inventory offered promotes Mattress Pal's position in the marketplace as a mattress specialist. Since inception in 2012, Mattress Pal has served over 250,000 customers and has built a strong reputation in the mattress retail market.

**B.** **The Debtor's Organizational Structure**

7.      Mattress Pal is a Florida limited liability company formed as a joint venture between SOS and United Corporation ("United"), a U.S. Virgin Islands corporation, pursuant to a Joint Venture Agreement, dated November 17, 2012. The parties created Mattress Pal with a business plan to open and operate retail mattress stores, an internet website, engagement in wholesale transactions of mattresses, bedding and related accessories under the trade names "Mattress One" and "Mattress 1 One" (collectively, the "Trade Names") outside the State of Florida.

8.      SOS is a Florida corporation that sells mattresses throughout Florida using the same Trade Names. Initially, Mattress Pal was owned equally by SOS and United. Through a series of amendments to the Joint Venture Agreement instigated by United's interference with Mattress Pal's business and United's repeated failure to make timely capital contributions, SOS acquired full ownership of Mattress Pal in December 2016.

**C.** **The Debtor's Capital Structure**

9.      The Debtor has no secured debt and pays for most of its business operations with funds generated from the sale of mattresses and bedding accessories.  At this time, Mattress Pal does not forecast a need for post-petition financing.

**D.** **Events Leading to Chapter 11**

10.     In 2012, Mattress Pal initiated business operations in Texas by leasing several retail locations. Soon after commencing business and as sales continued to grow, the company expanded operations with other leased locations, despite the business setbacks caused by United. At its peak in 2016, Mattress Pal operated 145 retail locations and one warehouse distribution center building a true statewide presence with approximately $65 million in gross sales.

11.     Prior to 2017, Mattress Pal embarked upon an aggressive expansion of its retail footprint, which was, in hindsight, poorly timed in relation to several other events in the overall market. The national mattress market suffered along with the general brick-and-mortar retail market. Fierce competition from online bed-in-a-box retailers led to a market shift resulting in lower margins and declining sales. In August 2017, casualty damage and business interruptions caused by Hurricane Harvey exacerbated Mattress Pal's economic decline. Recently, the Texas Department of Revenue claimed that Mattress Pal owes approximately $950,000 in sales tax, including substantial penalties and interest. More recently, the Debtor's credit card payment processor, Paymentech, started withholding excessive reserves (now exceeding $400,000) from sales proceeds payable to Mattress Pal. All these events contributed to the Debtor's liquidity crisis and forced the company to commence store closings.

12.     The biggest culprit causing this bankruptcy filing, however, is Mattress Pal's immersion in several expensive and time-consuming lawsuits with landlords. As of the Petition Date, Mattress Pal is a defendant in approximately ninety (90) lawsuits pending in several jurisdictions.

13.     Prior to the Petition Date, Mattress Pal and SOS undertook several initiatives designed to reduce the Debtor's losses associated primarily with under-performing stores and widespread litigation with landlords. Notably, SOS and its principals invested and loaned substantial time and resources, including in excess of $25 million, to Mattress Pal. While these

contributions of time and capital produced mixed results, liquidity reached a point where rents and other costs were unable to be paid timely, which led to significant disruptions in business operations. Among the initiatives undertaken were the following:

- *Closure of under-performing stores* - Debtor closed sixty-six (66) stores between 2017 and the present. As of the Petition Date, Debtor operates seventy-nine (79) stores and one (1) warehouse distribution center.

- *Focus on core markets* — Debtor is exiting stores in non-core markets where store density is inadequate to justify continued investment in areas such as advertising and distribution.

- *Improve store level operations* — Debtor undertook plans to improve productivity of the remaining store base including by (a) shifting merchandise mix, changing personnel and renegotiating occupancy cost in strong markets to improve store level performance; (b) seeking to leverage experienced management and consolidated marketing; and (c) adding stores in certain markets which are core to future growth, but currently have limited store density.

- *Streamline corporate operations* — During the fiscal year ending 2018, Debtor restructured corporate operations, including the field management to better leverage talent, become more responsive, and reduce costs. Debtor has also undertaken initiative to improve inventory management, enhance marketing efforts and drive additional revenue through all its stores by expanding and refining product offerings.

14.    Notwithstanding the Debtor's restructuring initiatives, Mattress Pal's liquidity problems continued, and it became even more difficult for the company to meet its day-to-day cash operating needs and obligations to landlords. The Debtor has continued to incur operating losses through the first quarter of fiscal year 2019. Some of the Debtor's vendors have discontinued or reduced credit terms further constricting the Debtor's cash flow. Such difficulties, together with the heavy payment obligations to landlords and Paymentech's excessive credit card reserve policy, led the Debtor to conclude that it was unlikely to be able to consummate a successful restructuring outside of chapter 11. As a result, the Debtor determined to seek relief under chapter 11 of the Bankruptcy Code to achieve stable day-to-day operations and use the breathing room afforded by chapter 11 to pursue its long-term strategic alternatives.

15.    As of December 31, 2018, the Debtor had aggregate assets and liabilities of approximately $8.7 Million and $10.0 Million, respectively.  For the fiscal year ending December 31, 2018, Debtor generated gross revenues of approximately $42 Million, a significant decline from prior years.

16.    To maximize the values for all stakeholders, the Debtor has determined that a going concern chapter 11 process will produce the best outcome for the benefit of all creditors and equity holders. To assist with right-sizing the company, the Debtor has targeted several additional underperforming stores for closure and will be seeking Court approval for the rejection of several leases. The Debtor does not plan to conduct liquidation sales at any store locations. Instead, the Debtor will transfer inventory to other stores, its warehouse, or it could decide to abandon showroom products. The Debtor also plans to improve its advertising, offer better products, upgrade its e-commerce platform, and acquire new store locations in developing areas.

### III.    FIRST DAY PLEADINGS

17.    Contemporaneously with the filing of the Chapter 11 Case, the Debtor filed the following First Day Pleadings seeking relief that is necessary to enable the Debtor to efficiently administer its estate with minimal disruption and loss of value during the Chapter 11 Case.

18.    I am familiar with the content and substance of the First Day Pleadings.  Approval of the relief sought in each of the First Day Pleadings is critical to successfully implementing the Debtor's chapter 11 strategy efficiently and with minimal disruption to its business operations thereby permitting the Debtor to preserve and maximize value for the benefit of all stakeholders.

19.    The facts set forth in the First Day Pleadings are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.  If asked to

testify as to the facts supporting each of the First Day Pleadings, I would testify to the facts set forth below.

**A. Debtor's Motion for Entry of Interim and Final Orders Authorizing (I) Continued Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Checks and Business Forms, and (III) Waiving the Requirements of Section 345(b) of the Bankruptcy Code (the "Cash Management Motion")**

20.     Through the Cash Management Motion, the Debtor seeks entry of interim and final orders (i) authorizing the continued maintenance of existing bank accounts, (ii) authorizing the continued use of existing checks and business forms, and (iii) waiving the requirements of section 345(b) of the Bankruptcy Code.

21.     As of the Petition Date, the Debtor maintains four (4) bank accounts in the ordinary course of its business (collectively, the "Bank Accounts").  The Debtor makes thousands of payments each year totaling nearly $50 million in the aggregate for fiscal year 2018, and all operating revenue and business expenses, including payroll, flow through the Bank Accounts.  The Bank Accounts and estimated amount on deposit as of the Petition Date are described below:

| Bank of America P.O. Box 25118 Tampa, Florida 33622-5118 | | |
|---|---|---|
| **Category** | **Description** | **Account Number** |
| Payroll Account | This account is funded monthly from the Primary Account with an amount necessary for the forecast payroll costs for the next month. | *****8913 $5,281.82 |
| Primary Account | This account is funded monthly by revenue from the Receivable Account and Counter Deposit Account. Money in the Primary Account is moved once per month to fund the Payroll Account for expected payroll expenses.  Debt payments and related fees are paid directly from the Primary Account. | *****3122 $46,217.10 |
| Receivable Account | This account is funded almost daily by receipts from ACH transfers, credit card processors and merchant finance sources. | *****8939 $25,354.47 |

| | Bank of America<br>P.O. Box 25118<br>Tampa, Florida 33622-5118 | |
|---|---|---|
| **Category** | **Description** | **Account Number** |
| Counter Deposit Account | This account is funded almost daily by cash and checks tendered for purchases at retail store locations. All deposits to this account are transferred to the Primary Account on or about the same date such cash and checks are deposited. | *****8926<br>Zero Balance |

22.  Maintaining the Bank Accounts is a practical necessity for the Debtor's business and essential to sustain day-to-day business operations. The Bank Accounts are integrated with the Debtor's system for procuring inventory from suppliers and receiving revenue from customers who pay for products with cash, checks, money orders, debit cards and credit cards. Further, the Bank Accounts are used to pay the Debtor's employees, landlords and vendors.

23.  Mattress Pal's continued ability to (i) procure inventory from suppliers, (ii) receive revenue from customers, (iii) pay employees, and (iv) maintain regular payments to its landlords, vendors, and other creditors is critical to the Debtor's reorganization efforts. Maintaining the Bank Accounts will further those efforts by minimizing disturbance to the payment arrangement with the Debtor's suppliers, landlords, vendors and employees, among others.

24.  Furthermore, the Bank Accounts are held by Bank of America, which is a Federal Deposit Insurance Corporation ("FDIC") insured financial institution. Bank of America is a depository approved by the United States Trustee, and thus allowed to hold debtor-in-possession accounts.

25.  In the ordinary course of its business, the Debtor uses a variety of checks and other pre-printed business forms (collectively, the "Business Forms"). Because of the nature and scope of the Debtor's business operations and the number of suppliers of goods and services with whom

the Debtor transacts business on a regular basis, it is important that the Debtor be permitted to continue to use its Business Forms without alteration or change.

26.     Use of Business Forms substantially in the forms existing immediately before the Petition Date, without reference to its status as debtor-in-possession, would avoid disruption of the Debtor's business and unnecessary expense.

**B.  Debtor's Motion for Entry of Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (II) Approving Adequate Assurance of Payment, (III) Approving Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief (the "Utility Motion")**

27.     Through the Utility Motion, the Debtor seeks entry of an order (i) prohibiting utility service providers from altering, refusing or discontinuing services, or discriminating against the Debtor, on account of commencement of the Chapter 11 Case or unpaid prepetition invoices; (ii) approving the Debtor's proposed form of adequate assurance to provide the utilities with adequate assurance of payment for post-petition services within the meaning of section 366 of the Bankruptcy Code; (iii) approving the Debtor's proposed procedures for resolving disputes regarding adequate assurance; and (iv) granting related relief.

28.     In the ordinary course of its business, the Debtor receives various utility services (collectively, "Utility Services") from the entities identified on **Exhibit C** to the Utility Motion (the "Utility Companies"). Prior to the Petition Date, the Debtor was current with respect to undisputed invoices for Utility Services. No Utility Companies hold security deposits for the Debtor.

29.     The Utility Services are essential to the Debtor's ability to sustain operations while the Chapter 11 Case is pending and, therefore, to the success of the Debtor's reorganization. Any interruption of Utility Services, even for a brief period, would severely disrupt Mattress Pal's business operations and would be extremely harmful to its customer relationships, revenues,

profits, and ultimately its ability to maximize the recovery for stakeholders. It is therefore critical that all Utility Services continue uninterrupted.

30.    To provide adequate assurance to the Utility Companies identified on the Utilities List, the Debtor proposes to deposit $50,000 (the "Adequate Assurance Deposit"), an amount equal to approximately two weeks of the cost of Utility Services for each Utility Company, into a segregated account (the "Adequate Assurance Account") for the benefit of the Utility Companies. The Adequate Assurance Deposit, if approved, will be held in the Adequate Assurance Account for the duration of the Chapter 11 Case and may be applied to any post-petition defaults in payment to the Utility Companies. No liens will encumber the Adequate Assurance Deposit or the Adequate Assurance Account.

31.    The address for each Utility Company is listed on **Exhibit C** to the Utility Motion. The Adequate Assurance Deposit, in conjunction with the Debtor's ability to pay for future Utility Services in accordance with its prepetition practices, constitutes sufficient adequate assurance of future performance to the Utility Companies.

## C. Debtor's Motion for Order Authorizing Payment of Prepetition Wages, Compensation and Employee Benefits ("Employee Compensation Motion")

32.    In the ordinary course of its business, the Debtor incurs payroll and various other obligations to its employees. The Debtor currently employs approximately 132 employees in connection with its business operations. The Debtor has incurred costs and obligations owed to employees that remain unpaid as of the Petition Date because they accrued, either in whole or in part, prior to the Petition Date. Even though they arose prior to the Petition Date, these obligations will only become due and payable in the ordinary course of the Debtor's business on or after the Petition Date.

33.    Honoring the Debtor's prepetition employee obligations will minimize the

hardship that employees will certainly endure if payroll is interrupted.  Honoring such employee

obligations will also prevent the wholesale loss of employees that could ensue as a result of the

collective employees' loss of the reasonable expectation that they will be compensated for

services rendered.  As such, the Debtor seeks to continue paying employee compensation in the

ordinary course.

**D. Debtor's Motion for Order Authorizing Continued Maintenance of Customer Service Programs ("Customer Service Motion")**

34.    As with most specialty retail companies, the Debtor offers coupons, gift

certificates, and other discounts, merchandise credits, returns, refunds, merchandise guarantees,

low price guarantees, the ability to place deposits for special-order merchandise, special internet

offerings and other similar customer programs, practices and commitments (collectively, the

"Customer Practices"), designed to develop and sustain goodwill in the marketplace in

connection with the sale of its merchandise. All these programs provide valuable services to

Debtor's customers and are profitable for the Debtor.

35.    The Customer Practices are designed to distinguish the Debtor from its

competitors, ensure customer satisfaction and generate goodwill for the Debtor — thereby

retaining current customers, attracting new customers and ultimately enhancing net revenue.  The

success and viability of Debtor's business is dependent upon the loyalty of its customers.  This is

particularly true in the specialty retail industry where the relevant market for such products is

competitive.  Absent authorization from the Court, the Debtor will be unable to honor or perform

some or all the prepetition obligations that arose in connection with the Customer Practices prior

to commencement of the Chapter 11 Case. The Debtor believes that the failure to continue the

Customer Practices will result in a significant deterioration in its relationships with its customers

and irreparably damage Debtor's standing in its highly competitive specialty retail industry.

Such loss of credibility would cause a corresponding material reduction in sales and revenues, and thereby jeopardize Debtor's ability to effectuate a successful reorganization.

36.     The Debtor seeks authority to honor and perform all prepetition obligations that arose in connection with the Customer Practices in order to maintain its customer goodwill during the pendency of the Chapter 11 Case.  Absent such relief, the Debtor's customer relations will be severely and irreparably harmed at a time when customer loyalty and patronage is critical to Debtor's reorganization efforts. Thus, the Debtor requests authority to continue the Customer Practices because such practices have proven to be successful business strategies for generating valuable goodwill, ensuring repeat business and increasing Debtor's net revenue.  The Debtor believes that maintaining these benefits throughout the Chapter 11 Case is essential to the continued vitality of its business -- and ultimately to its prospects for a successful reorganization. The Debtor believes that the failure to continue its Customer Practices can erode the Debtor's goodwill and ongoing business relationships if its customers perceive that the Debtor is unable or unwilling to fulfill the prepetition promises it has made through the Customer Practices. The Debtor further believes that it is critical that it be authorized to honor its prepetition obligations related to the Customer Practices because the specialty retail industry is competitive, and the Debtor's failure to honor such obligations could significantly limit its ability to attract new customers and retain its current extensive customer base.

**E.  Debtor's Motion for Entry of an Order Granting Additional Time Within Which to File Schedules and Statements of Financial Affairs ("Schedules Extension and Waiver Motion")**

37.     Through the Schedules Extension and Waiver Motion, the Debtor seeks entry of an order (i) extending by twenty (20) days the deadline within which to file schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements").

38.   Cause exists to extend the deadline for filing Schedules and Statements. Preparation of Schedules and Statements imposes a substantial burden on the Debtor's management already burdened by the time and attention required to address other aspects of the restructuring process.

39.   Extending the deadline to file Schedules and Statements will enhance the accuracy of the information contained therein. The Debtor receives invoices from most trade creditors on a monthly basis on account of goods or services provided during the previous month, and the Debtor generally is current on payments to trade creditors.   An extension of the deadline to file the Schedules and Statements by twenty (20) days should allow the Debtor to receive all or most of the invoices that cover the prepetition period and would thereby permit the Debtor to list much more accurately claims for goods or services rendered prepetition but not invoiced until after the Petition Date.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on April 6, 2019

_____
Madhat Salem
Vice President
Mattress Pal Holding, LLC